And we will hear first from Mr. Rolfing. Good morning. May it please the Court. Lawrence Rolfing on behalf of Rony Romero. This is a social security disability case. Mr. Romero had a psychotic break and immediately applied for disability benefits. His journey starts in September of 2019. His claim is denied initially in February of 2020 and on reconsideration in April of 2020. As of April 2020, he was still five months away from his statutory one-year duration requirement. And both Dr. Paxson and Dr. Patterson opined that by September of 2020, he will be better. I mean, that's one reading of it, but, you know, the document seems somewhat ambiguous. And don't we normally defer to the agency's interpretation of ambiguous evidence if it can be read two different ways and they adopt one way, we have to go along with that? That's the usual rule, but this exists in a slightly different context. We should readily assume under a doctrine of governmental regularity that Dr. Paxson and Dr. Patterson actually know what they're doing, and they're following the guidelines that are in the program's operation manual system, commonly referred to as POMS. And POMS in 24510.020A sets out the policy principle, and there's a note at the bottom of that section in the POMS, do not project severity if a claimant's impairments, though severe, does not currently prevent substantial gainful activity, SGA. And so why would Dr. Paxson and Dr. Patterson say by September of 2020, this is going to be his residual functional capacity? And POMS answers that question. There's a lot of points in these documents where they use the present tense. They go through all the issues. He is capable of doing this. He retains adequate ability to comply. It all seems like it's being done in the present, not that he will be able to do this later. I understand, you know, the summary comment, it does read more the way you want it, but there's other parts of the document that read a different way, and that's normally we don't get to second-guess agencies when they read ambiguous things. Well, part of the problem with ambiguity, if there is one, and to me the labeling of this RFC as projected is dispositive, but if we're struggling with an ambiguity, the first thing we need to do is say this is ambiguous. The judge didn't think it was ambiguous. The judge didn't think it was ambiguous at all. The judge thought that this applied from September of 2019 when he gets out of the hospital until the date of adjudication in 2021. There's no recognition of ambiguity. There's no dealing with the fact that both Dr. Patterson and Dr. Paxton said the residual functional capacity is effective September 2020. And that's clear. And under Vincent, the Heckler and the cases that have followed Vincent for the last 40 years have said that when there's probative evidence, the judge must address that probative evidence. And that's a basic tenet of administrative law. And so when Dr. Patterson and Dr. Paxton say this is the residual functional capacity and as of September 2020 and then uses the present tense verb later on underneath that heading, the judge should at least address that, but she didn't. She didn't address that. Because POMS is clear. They don't exercise their medical adjudicative responsibilities under the statute and the regulations to project an RFC as of September of 2020 instead of currently, which is the label that is typically on a residual functional capacity assessment, or they're projecting because of the date last insured in a Title II case is in the past, they'll say as of that date last insured, this is a residual functional capacity, or there's an insufficient evidence residual functional capacity. Those are the four flavors that we get in this administrative paradigm. And Dr. Patterson and Dr. Paxton were clear that this is a projected residual functional capacity. And to not countenance that projection is clear error. Mr. Rolfing, I guess I'm not sure what to make of that. And, of course, as Judge Collins has said, this is a substantial evidence review. Can you speak a little bit to the ALJ? I did spend quite a bit of time discussing a pretty consistent record of Mr. Romero's mental acuity judgment. Why shouldn't we credit all of that as being decisive here? Under this court's decision in Tackett, the judge isn't allowed to go it alone. The judge needs evidence that is probative and significant. Well, this is based on repeated remarks in the medical record as well as both opinion evidence as well as the secondhand reporting of Mr. Romero's reports to these experts. So I'm not talking about where he's going it alone. There's pretty consistent evidence of him being, again, good judgment. Why isn't that decisive? What did he miss? The mental status examination typically contains 27 points of inquiry. But the regulations, the Appendix 1, Listing 12.00, Paragraph C2, lists the things that are necessary to consider in terms of assessing a mental residual functional capacity. And good judgment is a fraction of that equation. So in October of 2020, for instance, so this is the first visit after the 12-month anniversary. He's still having anhedonia two or three times a week. They want to get it down. He's still having inappropriate response to internal stimuli two to three times a day. Two to three times a day. He's responding to internal stimulation that is impacting his ability to function. So he may have good judgment. He may know not to commit homicide or murder. He may know to drop a stamped envelope in a mailbox. He may understand that he's having mental health symptoms. You have good insight. But that doesn't mean that he's not still responding to internal stimulation. In October of 2020, two to three times a day. Do you have some time for rebuttal? Yes, please. Thank you. All right, so we'll hear now from Ms. Fierer. Good morning, Your Honors. Elizabeth Fierer on behalf of Martin O'Malley, the Commissioner of Social Security. The record in this case has a pretty obvious and clear trajectory from the time when this claimant had his breakdown in October 2019. His alleged onset date is actually a month prior to that. I'm not sure why. But in October 2019, he had a breakdown where he was hallucinating and he was delusional. And this was brought on by drug use. He's admitted on several occasions that it was marijuana and mushrooms that he took at this time. So this is October 2019. Almost immediately after that, he starts improving. He starts improving in the hospital when he's properly medicated. Then he has another incident in December 2019 where he goes back to the emergency room. And that's because he has suicidal ideation at that time. But it's much shorter than the previous hospitalization. And he's not delusional at that time. So he's already improving by the time that Dr. Patterson first looked at this record in February 2020. And by that time, irrespective of whether the court wants to find that the functional capacity in Dr. Patterson's and Dr. Paxton's findings projected or not, I would agree with Judge Collins that it's in the present tense. And by February, which is the earliest that these doctors are looking at the record, he's already considerably improved from the time that he had his breakdown, which was the impetus of his disability claim. There are two things about the reports. Well, actually, three things that are significant. One is that it says, although your condition is limitations are currently severe, then, you know, it will get better, basically. The other is this focus on 12 months. And 12 months just wasn't randomly picked out of the air. It's not always in the palm. It's in the statute that it has to be over 12. So obviously looking at that issue, which, you know, we don't always see in these. Usually they just say they are or they aren't. And to invoke the 12 months suggests you think something's different about this case. And the third thing, which I initially thought maybe was a typo, was the use of EOD rather than AOD, which would suggest, again, all these data points think that they really do think he's got a lot of problems now, but it won't last 12 months. And this ALJ seemed to just totally miss this issue. Well, I don't think the ALJ has an obligation to address this issue. Let's assume that the DDS psychological consultants filled this out the correct way. That still shows, both reports show that within 12 months from the, let's say, EOD, which would be his, because they use EOD, established onset date, and AOD almost interchangeably. So let's assume it's the alleged onset date that's the established. That is September 2019, which predates the medical emergency kind of situations. But within 12 months, both of these doctors have said that the claimant will have the ability to work under the parameters that they set there. So an ALJ is not... But the ALJ didn't seem to realize this was a projection and treated it as evidence of current contemporaneous capacity. And given what seems like a clear mistake, does that mean it has to go back? I mean, maybe the ALJ will reach the same conclusion, but maybe it needs to go back, because we can't reweigh this if we think that this got messed up. Well, you don't have to reweigh it. First of all, I will say that I don't think the ALJ had any obligation to address the temporary, even if it was projected, because the record proves that the claimant improved within the parameters set forth in those DDS reports. So what the ALJ did was look at the record as a whole, and she addressed what is in those reports. So let's assume it's projected. By the time that 12 months is up, the ALJ is looking at the record, and the ALJ has more evidence in front of her. But the ALJ also, I mean, discussed. I think there's a significant discussion of the fact that Mr. Romero is not compliant with medication. And this is, I think, the projections all have to be predicated on complying with a treatment plan. What are we to do with that? Well, that is part of the complying with treatment was that he stay off drugs. And by the end of December 2019, he's reporting that he's off drugs. That's one part, but it's pretty clear that there are some psychiatric symptoms that are being treated with several different drugs. No question. And there was a few more points that I wanted to make about the state agency reports and the ALJ's RFC finding. The ALJ looked at those in the context of the record as a whole and decided that the claimant was, in fact, at the time of her decision, a little bit more limited. So she added social limitations. She added concentration within two-hour increments, and she had a prohibition against fast-paced work and production-level work. So, but back to the treatment. So if you look at what the record shows regarding his medication compliance, back in October 2019, when everything happens, page 636, he's not taking his medications. He also says that in November 2019, he's telling Dr. Ingram that he doesn't want to take Abilify, and he says it's because of weight gain. She says it's weight-gain-neutral medication, but all antipsychotics are going to probably cause weight gain. So the claimant's not taking in November 2019. Then by December 2019, he's telling, he's refusing, and this is Dr. Ingram on page 609, he's refusing physical therapy or one-on-one therapy. He stopped taking another medication because of sexual side effects, and he stopped taking Abilify on his own and against medical advice. But then by, he's still improving even with this. So the point of the ALJ's reliance on this treatment history and this lack of compliance is that he's not taking, he goes on and off his medications against medical advice. And there's a page, on page 1086, this is in July 2020, Dr. Lewis, who's another treating physician who comes in later in the game, she discusses with claimant that he has to take his meds for 30 days for them to be effective. Can you point me to a portion of the ALJ's decision where it indicates that the ALJ considered Romero's explanations for going on, off his medications? I mean, did she explain it? I don't think she did. She's just talking about how he's going on and off. And that is under our Social Security ruling, 16-3P. A claimant's willingness or need to stay on a prescribed course of treatment does go to the verity of his subjective allegations overall. And if this claimant is not taking his meds the way he's supposed to, he's not waiting the 30 days to make sure that they're effective, that shows, and he's more concerned about his weight gain. There's a case law that says that sometimes people don't stay on their medication because of the underlying illness itself, and when that is suggested in the record, that's something the ALJ has to consider. What's your response to that case? Well, we have the reasons why he stopped taking them. At several points, he notes weight gain. That's not a psychiatric symptom that would prevent him from taking medications. He also talks about the sexual side effects of other medications. That shows that he's much more capable. He's thinking about these meds not in terms of their therapeutic effect for his mental illness. In fact, at page, I believe it's page 1074, he says he'd rather be skinny and have a personality disorder. So he's telling us why he's not going. I mean, we're aware of the record, and we can pick out these pieces. I guess pivoting off of the question of his own testimony, I believe we also have case law that requires the ALJ to provide clear and convincing reasons. I see several reasons. It's well documented with respect to the testimony I discussed with your friend in terms of his kind of mental competence on good days. Where does the ALJ provide clear and convincing reasons that address his direct testimony on the fact that, you know, for half of a week he could be unregulated, insomnia, anxiety? That seems pretty significant, and I don't see the ALJ paying as much attention to that piece as to these other reports. Well, the ALJ's discussion of the subjective symptoms is on page 17 and 18. But the ALJ knows that this claimant is limited, and she knows that he has significant. . . Just to come back to this, the ALJ on 17 and 18 says the claimant alleged delusions, insomnia, et cetera. The ALJ focuses on coherent. Obviously some of the more troubling symptoms of psychosis addresses that. Insight, good. Obsessive-compulsive ideals, that intact memory, but doesn't seem to come back to what seems to be quite material evidence of the fact that he can't make it through a week awake on regular sleep patterns, the things that might even more directly affect his ability. And then the RFC points out that two hours at a time. So I still don't see the part where they're addressing the insomnia, the sleeplessness, the anxiety, as opposed to the mental coherency, which I agree is documented. Well, Your Honor, I don't think this record proves in any way that he can't get through a week because of insomnia. And I would like to also point to there are several references in the record from four different medical sources, Dr. Ingram, Dr. Salib, and Dr. Gutierrez and Dr. Morales, that say claimants, the psychotic symptoms that he had when he was hospitalized have now been reduced to irritability, anxiety, and symptoms of depression, which he has three to seven days a week, and they're hoping will be reduced to three to 30 days a week. Someone can have symptoms three to seven days a week. That doesn't disable them. We are not doubting that this claimant has psychiatric symptoms. He is able to work within the RFC that the ALJ assessed, which is consistent with the record, in which my opponent has not pointed to any legal or material error. I'm just not sure what to do with this, and I understand that the RFC is clear. How is he supposed to be employable if he can only work two hours at a time? I don't – there's nothing in the record that says he can only work two hours at a time. The RFC is remember and carry out simple routine tasks for up to two-hour periods of time with only occasional interaction with the general public. Am I misreading that? That means two-hour increments that, you know, like during a work day, there's two hours, and then you have a scheduled break, you have a scheduled lunch. That's not – the ALJ's RFC is for a full eight hours of work. And I would like to just address Judge Collins' point about the DDS doctor's reports and severe versus disabling. These doctors absolutely agreed that this claimant would have severe impairments for more than 12 months, but severe is the step two threshold. That doesn't mean disabling. It means that he has impairments that are going to continue to limit him, and that's what the ALJ found based on this record. Can I ask one final question? I know we've taken you over your time. If we were to find that the ALJ erred in failing to appreciate that the reports of Dr. Paxton and Dr. Patterson were projections and not contemporaneous evaluations, if we were to find that was a mistake, would it have to go back, or do you think this could still be upheld, that that error would be harmless? There would be no reason to remand it, and there's two reasons, because the ALJ looked at those reports the way she was supposed to and, in fact, found the claimant based on the rest of the record more limited than those doctors did. And the second reason is that if you look at the ALJ's decision – she found them more limited than both Drs. Patterson and Paxton did. She found what more limited? Claimant more limited. The RFC is more limiting than what those doctors said. So we know the ALJ looked at them in the context of the record as a whole. And given that, her decision is still supported by substantial evidence, irrespective of whether you think she should have acknowledged that these two reports were prospective. Substantial evidence still supports her findings, and it still shows that she adequately addressed the limitations contained within those reports. Thank you. In this case, we have doctors that reasonably agreed, Dr. Patterson, Dr. Paxton, that his functional capacity was likely to change. We have assessments, and counsel has agreed that he's still having symptoms three or more times per week, every week. I just disagree with her on one thing. Weight gain or weight loss is a significant recognized symptom of depression in Listing 12.04a, paragraph 1. Changes in weight are a symptom of a depressive symptomatology. And his concern about weight gain is reasonable. To go to your point, Your Honor, on the harmlessness issue, we can't be confident under stout what the result would be if the ALJ looked at this symptomatology that Dr. Paxton and Dr. Patterson are looking at, and then looking at his continued symptomatology in the year that comes after that to say that she would have reached the same result. She started from a flawed foundation, and once we take the foundation away, the whole house falls down. Thank you, Your Honor. All right, thank you, counsel. All right, the case just argued will be submitted.
judges: COLLINS, THOMAS, JOHNSTONE